## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CATERPILLAR WORLD TRADING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | No. 05-1080-MLB |
| | ) | |
| RODNEY WILLIAMS, d/b/a WILLIAMS | ) | |
| FARMS | ) | |
| | ) | |
| Defendant. | ) | |

_____

### MEMORANDUM AND ORDER

This case comes before the court on plaintiff's motion for summary judgment. (Doc. 34.) The matter has been fully briefed and is ripe for decision. (Docs. 35, 36, 45, 46, 51, 52.) Oral argument was held on December 8, 2006. Plaintiff's motion is GRANTED for reasons set forth herein.

**I. Summary Judgment Standard: FED. R. CIV. P. 56**

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.

1998) (citations omitted); see also Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (citing Adler).  The mere existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment because the factual dispute must be material.  See Renfro v. City of Emporia, 948 F.2d 1529, 1533 (10th Cir. 1991).

The moving party must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law.  Adler, 144 F.3d at 670.  The nature of the showing depends upon whether the movant bears the burden of proof at trial with respect to the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar materials negating the opponent's" claims or defenses.  Celotex, 477 U.S. at 323 (emphasis in original).  Rather, the movant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's claim.  Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at 325).

On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim entitling it to judgment as a matter of law.  See e.g., United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc); United Mo. Bank of Kansas City v. Gagel, 815 F. Supp. 387,

-2-

391 (D. Kan. 1993).[1]  Moreover, the moving party must show the absence of genuine issues of fact regarding each of the affirmative defenses specifically reserved by the non-moving party.  Gagel, 815 F. Supp. at 391.  "The party moving for summary judgment must establish its entitlement beyond a reasonable doubt."  Id.

If the moving party properly supports its motion, the burden shifts to the nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Muck v. United States, 3 F.3d 1378, 1380 (10th Cir. 1993).  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  Adler, 144 F.3d at 671.  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted.  Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 533 (10th Cir. 1994).  A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988), aff'd 939 F.2d 910 (10th Cir. 1991).  Put simply, the nonmoving party must "do more than simply

---

[1]  The court notes that the Rule 56 summary judgment standard is identical to that of a Rule 50 judgment as a matter of law standard, see Pendleton v. Conoco, Inc., 23 F.3d 281, 286 (10th Cir. 1994), and that "[t]he standard is particularly strict when such a ruling is made in favor of the party with the burden of proof."  Weese v. Schukman, 98 F.3d 542, 547 (10th Cir. 1996).  Under this strict test, the party bearing the burden of proof at trial earns a favorable ruling only when evidence is presented that "the jury would not be at liberty to disbelieve."  Weese, 98 F.3d at 547.

show there is some metaphysical doubt as to the material facts."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Certain local rules further govern the presentation of facts and evidence.  Local Rule 56.1 requires the movant to set forth a concise statement of material facts.  D. Kan. Rule 56.1.  Each fact must appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which the defendant relies.  See id.  The opposing memorandum must contain a similar statement of facts.  The non-moving party must number each fact in dispute, refer with particularity to those portions of the record upon which he relies and, if applicable, state the number of the movant's fact that he disputes.  The court may, but is not obligated to, search for and consider evidence in the record that would rebut one party's evidence, but that the other party has failed to cite.  See Mitchell v. City of Moore, 218 F.3d 1190, 1199 (10th Cir. 2000); Adler, 144 F.3d at 672.  All material facts set forth in a statement of facts are deemed to be admitted for the purpose of summary judgment unless specifically controverted.  See Gullickson v. Sw. Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th Cir. 1996) (applying local rules of District of Utah).  A standing order of this court also precludes drawing inferences or making arguments within the statement of facts.

The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.  See Thomas v. Int'l Bus. Machs., 48 F.3d 478, 485 (10th Cir. 1995) (internal quotations and citations omitted).  For

example, hearsay testimony that would be inadmissible at trial may not be included.  <u>See</u> <u>Adams</u>, 233 F.3d at 1246.  Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. <u>See</u> <u>Cole v. Ruidoso Mun. Schs.</u>, 43 F.3d 1373, 1382 (10th Cir. 1994) (regarding conclusory statements); <u>Gross v. Burggraf Constr. Co.</u>, 53 F.3d 1531, 1541 (10th Cir. 1995) (requiring personal knowledge).  Finally, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e).  <u>See</u> Fed. R. Civ. P. 56(e); D. Kan. Rule 56.1; 10A Charles Alan Wright, et al., <u>Fed. Practice and Procedure</u> § 2722 (2d ed. 1983) (footnotes omitted).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  If sufficient evidence exists on which a trier of fact could reasonably find for the non-moving party, summary judgment is inappropriate. <u>See</u> <u>Prenalta Corp. v. Colo. Interstate Gas Co.</u>, 944 F.2d 677, 684 (10th Cir. 1991).

## II.  FACTS

Defendant is a farmer from western Kansas.  On December 14, 2001, he entered into a contract to purchase a Caterpillar combine from Darr Equipment Company of Guymon, Oklahoma.  The purchase price of the machine was $278,500.  Plaintiff was also a party to that agreement,

under which it agreed to acquire from Darr the account receivable resulting from the sale.  (Doc. 35 exh. 1.)

The contract provided that defendant would pay for the combine through annual installments of grain, which he would provide to plaintiff at a location to be determined by the latter.  Although payment in grain was presumably contemplated because defendant was a farmer, the contract did not require that the grain be grown on any particular tract of land; nor did it indicate that the grain had to be grown by defendant.  The agreement also provided that if the price plaintiff was willing to pay for the grain was less than the prevailing local market price, or if plaintiff had not developed a location for defendant to deliver grain, defendant could make his payments in cash.  Id. at 1-2.

Defendant claims that at the time the original contract was signed, neither Exhibit A to the contract (describing the particular machine at issue) nor Exhibit B (the delivery report) was attached. He further maintains that, although the balance of the written agreement is silent regarding the origin and model of the combine he was purchasing, the parties nevertheless contemplated that the combine contracted for was to be a brand new model produced off a new Caterpillar assembly line in Nebraska.  Defendant asserts that despite this understanding, approximately five days after he entered into the purchase agreement, Caterpillar announced that it was selling its agricultural products division (including the Nebraska plant) to AgCo. This meant that there would be no new Caterpillar combines from the Nebraska plant.  (Doc. 45 at 2-3, 5.)

Rather than taking up that issue with Darr and/or plaintiff,

-6-

defendant apparently undertook no efforts to determine how the sale of the Nebraska facility would affect the allegedly unwritten term in the contract.  Instead, he maintains that Darr unilaterally decided to provide him with an older, but otherwise new, combine from its inventory.  Defendant maintains that while the combine he received was new, it was a model from a prior year, and was therefore not the new 2002 model for which he contracted.  Id. at 3.

According to defendant, he was "required" to sign the Delivery Report on December 27, 2001, despite the fact that the machine had not been delivered at that time.  (Doc. 45 at 15.)  The Delivery Report specifically identified the combine by both model and serial number; thus, as of December 27, 2001, defendant new the precise machine that Darr was planning to provide to him.  The Delivery Report contains a hand-written note at the bottom indicating that actual delivery of the combine would not occur until January 2002.  The initials "R.L.W." and "J.F.B." are inscribed next to this note.  "R.L.W." would appear to be defendant's initials, and "J.F.B." are presumably the initials of the Darr salesman, John Baxa.

Defendant maintains that, although he signed the Delivery Report indicating that he received the combine in "satisfactory condition" on December 27, 2001, and despite the fact that the Delivery Report further contemplated delivery sometime in January 2002, the machine was not actually delivered until "shortly before 2002 wheat harvest." (Doc. 45 at 13.)  Neither party attempts to identify the date of

actual delivery with any more precision than that.[2]  The court notes that in this part of the country wheat harvest typically occurs in June.  The record also contains a number of UCC filings that occurred around the first of April, 2002.  (Doc. 35 exh. 2(i).)  Accordingly, it seems to be a safe assumption that the combine was delivered to defendant sometime around the first of April, 2002.

After taking possession of the machine, defendant claims that he notified Darr and plaintiff that the combine he received did not conform with the agreement, but that, due to the fact that he received the machine so near to harvest time, he had no choice but to use it. (Docs. 35 exh. 9 at 8; 45 at 13.)  And use it he did.  For almost three years defendant used the combine.  He put over 1,300 hours on it before plaintiff repossessed the machine in 2005.  Defendant concedes that he used the combine in Kansas and Wyoming.  (Doc. 35

_____

[2]  In its supplemental response, plaintiff states, "It is undisputed that the combine at issue was delivered to Defendant in January of 2002."  (Doc. 52 at 2.)  Plaintiff relies on paragraph 4 of its Statement of Undisputed Facts (Doc. 36 at 2) as support for this statement, which in turn relies on the Delivery Report.  As noted above, it is plain from the face of the Delivery Report that the document cannot be trusted to establish when the machine was delivered.  It shows a delivery date of December 27, 2001, while at the same time stating in a handwritten note that delivery would not actually occur until sometime in January of 2002.  While this may reveal a belief that the machine would be delivered in January, it is not evidence that delivery actually occurred in January.

By contrast, defendant stated in his affidavit that delivery did not occur until sometime just prior to wheat harvest.  He further specified the date as "Spring 2002," and "a few days before the harvest."  (Doc. 45 at 15.)  Finally, the court notes that plaintiff's own evidence further clouds the issue.  Plaintiff included in its motion a bill of lading dated March 8, 2002, suggesting that the machine was at Darr's store in Guymon on or about that date.  (Doc. 35 exh. 2(v).

For purposes of summary judgment, the evidence must be construed as indicating a delivery date in the spring of 2002.  Plaintiff is cautioned not to stubbornly maintain that a fact is undisputed when even its own evidence suggests otherwise.

-8-

exh. 9 at 6.)  Curiously, though, he never paid a dime during the first two years of use.

This failure to pay ultimately caused plaintiff to begin contacting defendant.  Plaintiff mailed its first notice of default to defendant on May 3, 2004.  (Doc. 36 at 3.)  Defendant denies that he ever received the letter.  (Doc. 45 at 6.)  Nevertheless, on July 31, 2004, defendant made his first and only payment on the machine in the amount of $10,000.  (Doc. 36 at 4.)  On August 24, 2004, plaintiff sent another notice of default to defendant.  This notice included a request for defendant to voluntarily surrender the combine.  Id. Defendant concedes that he received this notice.  (Doc. 45 at 7.)  In response, defendant's counsel sent a letter unilaterally declaring that the time for payment had been extended until "the end of the crop season 2005" due to the fact that there had been a drought for the preceding three years.  (Doc. 35 exh. 5.)

Defendant alleges that he had telephone conversations with an individual named Pat or Peg, who was employed by plaintiff, in which he informed plaintiff of the drought.  (Doc. 35 exh. 9 at 9.) Defendant further asserts that Pat or Peg told him that he was excused from making payments because of the drought.  Id.  However, the only written evidence of drought contained in the record is a resolution passed by the Board of County Commissioners of Natrona County, Wyoming, which declares Natrona County an "agri-business disaster area" on account of drought.  (Doc. 45 at 17.)  The resolution only applies to the 2006 crop season, and is therefore irrelevant to the determination of whether defendant suffered drought conditions in Natrona County from 2002 through 2005, the years in which he possessed

-9-

the combine without paying for it.   Id.   Moreover, there is no evidence in the record with respect to any drought conditions in the other places where defendant farmed, including Kansas.

Plaintiff continued to send correspondence to both defendant and his counsel disputing the validity of the drought defense and demanding that defendant surrender the combine. (Doc. 35 exhs. 6, 7.) Then, in the spring of 2005, plaintiff repossessed the machine.  It was sold at auction in December of 2005.  Deducting the proceeds from the auction, and adding other expenses related to the repossession, plus interest, plaintiff claims that defendant is liable for a deficiency in the amount of $286,105.12.  (Doc. 36 at 5-6.)

Plaintiff asserts that defendant breached the purchase agreement by failing to make the required payments.  Plaintiff seeks to recover the deficiency realized after the combine was auctioned, plus interest.

## II.  ANALYSIS

### A.  Choice of Law

The contract at issue contains a choice-of-law provision calling for the application of Illinois law.  (Doc. 35 exh. 1 at 4.)  A federal court sitting in diversity applies federal procedural law and the substantive law that would be applied by the forum state. Burnham v. Humphrey Hospitality REIT Trust, Inc., 403 F.3d 709, 712 (10th Cir. 2005).  Consistent therewith, where a contract contains a choice-of-law clause, the court will apply the forum state's choice-of-law rules.  Midamerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006).  Under Kansas law, parties to a contract may select the law that will govern interpretation of their

agreement, and Kansas courts will generally honor that choice. Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005) (citing Brenner v. Oppenheimer & Co., 273 Kan. 525, 44 P.3d 364, 374 (2002)).

The parties do not appear to dispute the application of Illinois law. Plaintiff cites to Illinois law throughout its briefs. (Docs. 35 at 8-9, 13, 14; 46 at 4-7.) Defendant did not cite any law in his response brief, but he ultimately argued extensively on the basis of Illinois law in a supplemental brief, which the court authorized at oral argument. (Docs. 45, 51.) Accordingly, the court finds that the parties agreed to have their contract interpreted under Illinois law, and the court will honor that choice.

B.  Breach of Contract

Under Illinois law, "[t]he primary objective in construing a contract is to ascertain the intent of the parties and give effect to that intent." United Airlines, Inc. v. City of Chicago, 116 Ill.2d 311, 318, 507 N.E.2d 858, 861 (1987). The court interprets unambiguous contract language as a matter of law. Hessler v. Crystal Lake Chrysler-Plymouth, Inc., 338 Ill. App. 3d 1010, 1017, 788 N.E.2d 405, 411 (2003).

Under general contract law, Illinois rigorously enforces the "four-corners rule," thereby precluding resort to extrinsic evidence to interpret an unambiguous term. See Berthold Types Ltd. v. Adobe Systems, Inc., 101 F. Supp. 2d 697, 698 (N.D. Ill. 2000); J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 162 Ill.2d 265, 270-72, 642 N.E.2d 1215, 1218-19 (1994). However, under the Uniform Commercial Code (U.C.C.), which was adopted without modification in Illinois,

<u>Luria Bros. & Co., Inc. v. Pielet Bros. Scrap Iron & Metal, Inc.</u>, 600 F.2d 103, 108 n.1 (7th Cir. 1979), the rules regarding the use of extrinsic evidence are more liberal.  <u>J & B Steel</u>, 162 Ill.2d at 271-72, 64 N.E.2d at 1219.  Regrettably, the parties initially provided little help on this matter.  Defendant failed to cite any law in his response brief, and plaintiff cited only to Illinois general contract law regarding interpretation of the agreement.[3]  (Doc. 46 at 6-7.) However, after the court authorized supplemental briefing, the parties finally shifted their focus to the application of the Illinois U.C.C. (Docs. 51, 52.)

Article 2 of the U.C.C. applies to the sale of goods.  810 Ill. Comp. Stat. 5/2-102.  A combine falls within the category of goods. <u>See id.</u> 5/2-105(1).  Therefore, interpretation of this contract is governed by Article 2 of the Illinois U.C.C.

Article 2 expressly incorporates from Article 1 of the U.C.C. "general definitions and principles of construction and interpretation."  <u>Id.</u> 5/2-103(4).  Article 2 relies on the definition of the terms "Agreement" and "Contract" provided in Article 1, modified only to the extent that those terms be construed as relating to the present or future sale of goods.  <u>See id.</u> 5/2-106(1).

Under the U.C.C., an "agreement" is defined as

> the bargain of the parties in fact as found in
> their language <u>or by implication from other</u>
> <u>circumstances</u> including course of dealing or
> usage of trade or course of performance as
> provided in this Act.

<u>Id.</u> 5/1-201(3) (emphasis added).  As the underlined phrase and the

---

[3] Plaintiff did cite to U.C.C. cases in support of its arguments regarding waiver and revocation of acceptance.  (Doc. 35 at 8, 13-14.)

language following it clearly indicates, this provision of the U.C.C. modifies the four-corners rule in contract interpretation. Instead, extrinsic evidence is generally appropriate for determining the terms of the agreement. See, e.g., Capitol Converting Equip., Inc. v. LEP Transport, Inc., 965 F.2d 391, 395 (7th Cir. 1992) (noting that such extrinsic evidence as course of dealing may be meaningful in supplementing or qualifying the terms of an agreement); Pers. Fin. Co. v. Meredith, 39 Ill. App. 3d 695, 702, 350 N.E.2d 781, 789 (1976) ("[T]he language of a contract is not controlling as to the parties' agreement. Other circumstances such as course of dealing, usage of trade or course of performance are also relevant to the inquiry of the parties' bargain in fact. We believe the relevance of these considerations expresses a legislative policy in favor of courts' determining the actual agreement of the parties and against enforcing printed contract terms in a mechanical fashion.").

However, the U.C.C. distinguishes between an agreement and a "contract." 810 Ill. Comp. Stat. 5/1-201(11). While the agreement encompasses the total bargain contemplated by the parties, a contract is "the total legal obligation which results from the parties' agreement as affected by this Act and any other applicable rules of law." Id. The difference between an agreement and the resulting contract may be caused by additional terms incorporated by the U.C.C., such as implied warranties imposed under Article 2 section 314, White and Summers, Uniform Commercial Code Vol. 1 at 12 & n.5 (1996); or perhaps by excluding from the agreement terms the law will not enforce (i.e., due to unconscionability, illegality, statute of frauds, etc.). See 810 Ill. Comp. Stat. 5/2-201, 302.

Despite the liberalized use of extrinsic evidence under Article 1, Article 2 circumscribes that usage in some measure through its codification of the parol evidence rule.  According to that rule, terms

> which are . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
> (a) by course of dealing or usage of trade (Section 1-205) or by course of performance (Section 2-208); and
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Id. 5/2-202.  Under this provision, a court may not resort to extrinsic evidence to contradict the terms of an integrated written contract, but may rely upon such evidence under certain circumstances so long as the extrinsic evidence operates to explain or supplement the written terms.

In this case, the parties do not dispute the existence of a contract under which plaintiff agreed to purchase a new combine for a specified price.  Nor do they dispute the fact that a particular combine, as described in the Delivery Report, was actually delivered to defendant.  (Doc. 35 exh. 1 at 6; exh. 8 at 1.)  The primary dispute raised by defendant is that the combine he received was not the combine he contracted for.  (Doc. 45 at 2-3.)  Therefore, he argues, he was legally excused from paying for the combine, although he used it extensively for almost three years.

The court finds that the written agreement was intended to be the

-14-

final expression of the terms contained therein.   This finding is based, at least in part, on paragraph 11 of the agreement, which states, "This Agreement may be amended only by an instrument in writing executed by all Parties affected by such amendment."   (Doc. 35 exh. 1 at 3.)   This provision makes clear that the parties did not want the written portion of their agreement being subsequently modified by unwritten promises.

On the other hand, when construing the evidence in the light most favorable to the non-moving party, and in light of the liberalized use of extrinsic evidence under the U.C.C., the court finds that there is a disputed issue of material fact regarding whether the parties intended their written contract to be a final expression of their agreement with respect to _all_ the contract terms.   That is to say, while the parties intended to preclude subsequent modification of the terms expressed in their written agreement, they did not intend to preclude the existence of consistent additional, unwritten terms to which they agreed at or prior to the time of executing the written agreement, as contemplated by U.C.C. section 2-202(b).

Assuming the truth of defendant's allegation that the machine description and the delivery report were not part of the original contract, _id._ exhs. A, B, it is only natural to conclude that an agreement to purchase a piece of farm equipment for almost $300,000 would contemplate the model of the machine being purchased. Defendant's affidavit constitutes extrinsic evidence of this consistent additional term, which should be considered in determining the terms of the entire agreement.   810 Ill. Comp. Stat. 5/2-202(b).

-15-

Accordingly, for purposes of summary judgment, the court finds that the parties also contemplated that defendant would receive a 2002 model-year combine, rather than a model from a prior year.[4]  Thus, when plaintiff (or Darr) delivered a non-conforming model, defendant was faced with choosing among the options available to him under the U.C.C. when the seller tenders non-conforming goods.

When a seller tenders non-conforming goods, the buyer may either accept the goods or reject them.  810 Ill. Stat. 5/2-601.  A buyer accepts goods when the buyer

> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>
> (b) fails to make an effective rejection (subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Id. 5/2-606.  The courts finds that defendant may have accepted the goods under all three of these provisions, but most clearly so under subparagraph (c).  Although defendant contends that he notified plaintiff's employees that the combine was the wrong model, he nevertheless used the machine for almost three years without paying for it and, apparently, without repeating his complaint that he had received the wrong model.  During that time, he transported it back

_____

[4] The court finds that the location of the assembly plant is irrelevant.  The material issue is whether, at the time of contracting, the parties agreed that the combine was to be from the upcoming model year or the previous model year.

-16-

and forth between his farming operations in Kansas and Wyoming, placing over 1,300 hours on the combine. Finally, and most dispositive of this question, when plaintiff demanded that defendant surrender the equipment, he refused. (Doc. 35 exh. 5.) Such conduct is completely inconsistent with the notion that plaintiff still owned the machine. Accordingly, the court finds that defendant accepted the non-conforming goods.

Once a buyer accepts non-conforming goods, he is obligated to pay at the contract price. 810 Ill. Stat. 5/2-607(1). Moreover, if the buyer accepts non-conforming goods, knowing at the time of acceptance of a non-conformity, he is generally precluded from later revoking his acceptance on the basis of that non-conformity. Id. 5/2-607(2). The only exception to that rule is where the buyer accepts the goods "on the reasonable assumption that the non-conformity would be seasonably cured" by the seller. Id. In that circumstance, a buyer may revoke his acceptance of non-conforming goods if 1) the seller fails to "seasonably" cure the defect; 2) revocation occurs within a reasonable time after discovering the basis for revocation; and 3) revocation occurs "before any substantial change in condition of the goods which is not caused by their own defects." Id. 5/2-608(1), (2).

The court finds as a matter of law that defendant failed to revoke his acceptance of the combine for substantially the same reasons that the court found defendant had accepted the goods in the first place - defendant used the machine for over three years, put over 1300 hours on it, and refused to surrender the machine when directed to do so. Such conduct is legally inconsistent with the notion that the seller then owned the equipment. Id. 5/2-606(c); see

-17-

also <u>Barrett v. Brian Bemis Auto World</u>, 408 F. Supp. 2d 539, 547 (N.D. Ill. 2005); <u>In re S.M. Acquisition Co.</u>, 319 B.R. 553, 569 (Bankr. N.D. Ill. 2005).  "A buyer who chooses to revoke acceptance of goods has the same duties as if the buyer had rejected the goods."  <u>Sorce v. Naperville Jeep Eagle, Inc.</u>, 309 Ill. App. 3d 313, 321, 722 N.E.2d 227, 232 (1999).  Thus, if defendant had revoked acceptance of the combine, "any exercise of ownership by the buyer with respect to [the combine] is wrongful as against the seller."  810 Ill. Stat. 5/2-602(2)(a).  Accordingly, if defendant had revoked his acceptance, ownership of the combine would have reverted to plaintiff, and defendant was obligated to treat the machine as if it was plaintiff's property.  <u>See id.</u> 5/2-606(c).  That did not happen, and defendant's claim of revocation is rejected.  Since defendant has elected not to assert the non-conformity in any other defense to the fact or extent of plaintiff's damages, the court need not discuss those matters.  <u>See id.</u> 5/2-607(2).

C.  Drought

As an alternative defense, defendant claims that his performance under the contract was excused because of a drought that interfered with his crop production in Wyoming.  (Doc. 45 at 2-3.)  He bases this argument on the following language from the contract:

> 6.  CUSTOMER agrees to deliver and sell GRAIN to CWTC as payment for the MACHINE to a location determined by CWTC according to CWTC's purchase orders and CWTC agrees to purchase same from CUSTOMER, which will enable CWTC to credit CUSTOMER's MACHINE Receivable per the schedule below.  If CWTC GRAIN price is equal to local Market or higher, CUSTOMER is required to make payment in GRAIN to fulfill CWTC's contract obligation with Commodity Customer.

[PAYMENT SCHEDULE OMITTED]

If CWTC has not developed a location for CUSTOMER to deliver GRAIN, CUSTOMER agrees to pay CWTC in cash according to the schedule above.  CWTC will not be held liable for discounts/penalties taken by Commodity Customer due to grain quality.

.    .    .    .

12.  <u>No Party shall be responsible for delays or failures in performance resulting from an occurrence beyond the reasonable control of such Party which may not be overcome by due diligence.</u>  <u>Such occurrences shall include</u>, without limitation, the following: strikes or other labor troubles, lockouts, <u>acts of God</u>, material shortages, riots, acts of war, governmental regulations imposed after the fact, fires, earthquakes, <u>and other natural disasters</u>.  In the event of an occurrence giving rise to a delay or failure in performance, the Party whose performance is delayed or failed shall give prompt written notice to the other Parties stating the particulars and all efforts being taken to overcome the delay or failure.  The TERM of this shall be extended by the period of any such delay.

(Doc. 35 exh. 1 at 1-3 (emphasis added).)  Defendant contends that the drought amounts to an act of God or natural disaster that justified a delay in performance pursuant to paragraph 12.  (Doc. 45 at 4.) Defendant conceded at oral argument that the merits of this defense were weak, and that his primary defense was rejection or revocation of non-conforming goods.  Consistent therewith, defendant's supplemental brief failed to mention the drought defense.  (Doc. 51.) Nevertheless, the court will consider the defense because defendant has not totally conceded it.

Disposition of this defense is rather simple.  Even assuming that a drought actually occurred, and that a drought would excuse payment under the contract (a conclusion about which the court has serious

-19-

doubts), the contract expressly required that defendant give "prompt written notice" to plaintiff that his performance had been delayed. (Doc. 35 exh. 1 at 3.)  Defendant conceded at oral argument that no written notice was ever given, and there is no evidence in the record to the contrary.  Instead, all <u>alleged</u> notices to plaintiff were oral notices conveyed in telephone conversations.  (Docs. 35 exh. 9 at 6-7; 51 at 3, 7, 14.)  The court finds as a matter of law that such notifications failed to conform to the terms of the contract; therefore, they would not excuse defendant from his obligation to pay.

In the alternative, the court finds nothing in the contract that conditioned defendant's obligation to pay on his ability to grow grain on his farmland in Wyoming.  Instead, defendant was free to grow grain anywhere, which presumably he did because he accumulated 1,300 hours on the combine.  All parties agreed at oral argument that the only use for a combine was to harvest grain.  Therefore it is apparent that defendant was harvesting <u>something</u> over the almost three years that he used the machine.  Moreover, the contract did not require defendant to pay using grain that <u>he</u> grew.  Instead, he was free to purchase grain from any source if he was unable or unwilling to grow it on his own.  He could have provided that grain to plaintiff in fulfillment of his obligations under the contract.  <u>See</u> <u>Wickliffe Farms, Inc. v. Owensboro Grain Co.</u>, 684 S.W.2d 17, 18 (Ky. App. 1984).  Defendant failed to do that.

Ultimately, resolution of this issue turns on the question of which party had to bear the risk of crop failure.  Defendant asserts that plaintiff must be made to bear the risk that defendant would be unable to grow suitable crops.  Ordinarily, the individual promising

-20-

performance bears the risk of loss in a sale of goods up until the point when he tenders delivery of the goods. 810 Ill. Stat. 5/2-509(3). This view is incorporated into Article 2 of the U.C.C., section 615, where a seller's failure to perform or delay in performance is excused only where a contingency develops, "the non-occurrence of which was a basic assumption on which the contract was made." 810 Ill. Stat. 5/2-615(a).[5]

There is no evidence that the parties premised their agreement on the understanding that defendant would be excused from paying for the combine in the event of drought. Even if there was, section 615 imposes on a seller the duty to allocate his production amongst his customers. The uncontroverted evidence shows that defendant used the combine for over 1,300 hours harvesting grain over the years in which he possessed the machine. However, not one ounce of grain was ever delivered to plaintiff. In interpreting section 615, the Seventh Circuit has noted that "[t]he fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused." Luria Bros., 600 F.2d at 112. The parties appear to have incorporated this view into their agreement, wherein excuse or delay in performance is only authorized when the effect of the act of God or natural disaster could not be overcome by due diligence. (Doc. 35 exh. 1 at 3.) Defendant has failed to put

---

[5] Section 615 deals with delay or failure to perform by a seller. Under the terms of this agreement, since defendant agreed to pay in grain rather than a purely cash transaction, defendant would be considered a seller with respect to his grain, and a buyer with respect to the combine. 810 Ill. Stat. 5/2-106(a), (d); 2-105(1), (2); 2-106(1). Plaintiff would occupy the opposite roles in each of those transactions.

forth any evidence that would show that, despite his due diligence, he could not provide grain from his Kansas operations, or otherwise purchase grain on the open market, to satisfy his contractual obligations.

Taking collectively, the law and the facts show that under any legitimate interpretation of the contract, defendant could not use drought in Wyoming as an absolute excuse to delay all payments to plaintiff.  Defendant's arguments to the contrary are accordingly rejected.  Plaintiff's motion for summary judgment is GRANTED. Plaintiff shall file a statement indicating the amount due, including accrued interest, as of the date of this order.

A motion for reconsideration of this order under Local Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

-22-

Dated this __3d__ day of January 2007, at Wichita, Kansas.

                              s/ Monti Belot
                              Monti L. Belot
                              UNITED STATES DISTRICT JUDGE